IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Case No. 24-cv-02336-RMR-NRN

LAURELEI O'RYAN,
Plaintiff,
vs.

CITY OF FORT COLLINS,
Defendant.

---

**RESPONSE TO MOTION FOR SUMMARY JUDGMENT**

---

Plaintiff Laurelei O'Ryan, by her attorney Robert M. Liechty, responds to Plaintiff's Motion for Summary Judgment as follows:

## I. INTRODUCTION

This case is about retaliation, not threats of physical harm as Defendant infers. Plaintiff worked for the City's male-dominated water treatment plant for five years and repeatedly complained that women were being passed over for promotion. After she and another female employee were denied promotions in November, 2022, Plaintiff raised concerns of unfair treatment with her immediate supervisor, Tyler Wells, and also escalated those concerns to higher-level management. On January 5, 2023, she again complained to Wells about the perception of unfair treatment and told him that he should be afraid about how the discriminatory treatment might be perceived by others. She told Wells, and followed up in an email, that she was not threatening him.

Ms. O'Ryan never threatened Wells physically or otherwise, yet Wells alleged that he was afraid of physical harm from Ms. O'Ryan and she was placed on

administrative leave. Sometime after May 1, 2023, Ms. O'Ryan submitted a written complaint to management regarding discriminatory treatment. She was terminated on June 15, 2023, for violating the City's policy prohibiting threatening behavior based on her statement to Wells that he should be afraid of how the discrimination looked.

Plaintiff's claim is straightforward: a reasonable jury could find that but for her protected opposition to discrimination, the City would not have interpreted an ambiguous statement as a policy violation warranting immediate termination. Because the record permits a reasonable inference that plaintiff's protected activity made the difference in the City's decision to terminate her, summary judgment must be denied.

## II. LEGAL STANDARD

Summary judgment is warranted when (1) the movant shows that there is no genuine dispute as to any material fact and (2) the movant is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(a). *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The factual record and reasonable inferences must be construed in the light most favorable to the nonmoving party. *Self v. Crum*, 439 F.3d 1227, 1230 (10th Cir. 2006). The Court's sole task is determining whether the facts and evidence identified by the parties present "a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 251-52 (1986). "[Q]uestions of intent, which involve intangible factors including witness creditability, are matters for consideration of the fact finder after a full trial." *Prochaska v. Marcoux*, 632 F.2d 848, 851 (10th Cir. 1980).

## III. RESPONSE TO DEFENDANT'S STATEMENT OF UNDISPUTED FACTS.

Plaintiff agrees that all of defendant's facts are undisputed with the exception of ¶¶ 23, 25, 26, 32, 34, and 45, discussed below. However, plaintiff asserts that only the facts surrounding her six complaints of discrimination, including the incident on January 5 (the "you should be scared" incident), are material to this motion.

23. Plaintiff disputes that she told Mr. Wells at the time of the incident that she was making a threat. Indeed, she disputes that what she said can be taken as a threat. **See** plaintiff's additional facts *infra*, ¶ 68 and 69.

25. Plaintiff disputes that Mr. Wells could reasonably have believed that she put him in physical fear. *Id.* ¶¶ 57-60 and plaintiff's argument.

26. Plaintiff asserts that Mr. Stonecipher could not have believed that a small, unarmed woman could have actually physically threatened Mr. Wells. Indeed, Mr. Stonecipher believed that plaintiff was angry, not threatening: "Q. Have you assumed a reason in your own mind as to why she would have said you should be afraid of physical violence or something along those lines? … A. Yes, I would say I'd assume just the – a means of expressing anger and getting anger out. Q. Anger about what? What was she angry about? … A. My assumption would be that she was angry about not receiving the promotion." Defendant's exhibit A-3, page 22:10-22. **See also** fact 30.

32. In her meeting with Stonecipher a few weeks after January 5, plaintiff told Stonecipher what she was doing medically to improve her demeanor. She did not tell Stonecipher that she would stop complaining about discrimination. Exhibit 1, attached, plaintiff's third declaration, ¶ 1.

34. Plaintiff asserts that Stonecipher was not credible in saying he could not support plaintiff's return to work. **See** plaintiff's additional facts.

45. Plaintiff also asserts that Mr. Woolf was not credible in failing to understand that plaintiff told Mr. Woolf, regarding the "you should be scared " comment, that she was referring to the department opening itself up to possible sex discrimination lawsuits by women at the plant. **See** plaintiff's fact ¶ 74.

## IV. PLAINTIFF'S ADDITIONAL FACTS.[1]

57. In January, 2023, plaintiff was 52 years old, stood approximately 5'2" tall, and weighed 195 pounds. Statement of Facts, ECF 33-1, page 15, ¶ 1, supported by exhibit 2, plaintiff's declaration attached.

58. In January, 2023, Tyler Wells was in his mid-thirties, stood 6'2" tall, and weighed approximately 185 pounds. *Id.* ¶ 2.

59. In the confrontation on January 5, 2023, plaintiff did not swing at Mr. Wells, raise her fist at him, or touch him. *Id.* ¶ 3.

60. Plaintiff carried no weapon on January 5, 2023. *Id.* ¶ 4.

61. Plaintiff was never charged with assault or threat. In fact, no one from law enforcement ever interviewed her regarding how she could have physically threatened Mr. Wells. Exhibit 1, ¶ 2.

[1] Pursuant to this Court's protocol, the parties created a Chart of Undisputed Material Facts (ECF 33-1) for purposes of discussing the utility of a summary judgment motion. Prior to defendant's filing of its motion for summary judgment, plaintiff tried to make changes and additions to that Chart, but that proved unavailing. On December 15, 2025, this Court's judicial assistant emailed plaintiff to file supplemental facts with the instant response. Hence, some of plaintiff's facts are in the Chart and others are supported separately with the attached exhibits.

62. Tyler Wells and the City of Fort Collins knew that plaintiff was under psychological care in January, 2023. ECF 33-1, page 16, ¶ 5.

63. Plaintiff complained to Mr. Wells three times about her frustration with women being passed over for promotions, the third time occurring on January 5, 2023. *Id.* ¶ 6.

64. In January, 2023, Kathleen Ganzer (in the lab) and plaintiff were the only females in the water production part of the City's water department of approximately 22 employees. *Id.* ¶ 7.

65. Prior to January, 2023, the City recognized that plaintiff had a mental disability of being susceptible to stress in the workplace and, consequently, the City accommodated her by allowing her to work at night where she would not have to have much contact with employees. *Id.* ¶ 8.

66. On January 7, 2023, two days after the January 5 incident, plaintiff's doctor sent a letter to the City informing the City that she was changing medications which might make her more irritable. *Id.* ¶ 9. **See also** exhibit 3, Dr. House's note.

67. Tyler Wells emailed the following to plaintiff at 7:59 am on January 5, 2023, referring to himself in the third person:

> Laurelei [plaintiff] said that she was not happy with hiring process for the lead operator position and that the hiring of Jeff [over her] further demonstrated that there was a pattern in hiring that overlooks Laurelei. Laurelei then turned to Tyler and said that Tyler should be scared and Tyler asked how and why and Laurelei repeated again that Tyler should be scared . Tyler asked if Laurelei was threatening him and she said that she was. Tyler decided to end the conversation at that point and decided to leave. Laurelei yelled at Tyler as he was leaving then followed Tyler to the door and slammed the door very violently.

Exhibit 4, email, bottom of page.

68. In plaintiff's response 20 minutes later, she wrote the following:

> I never said "you should be scared " I said you should be scared (collective you) at how bad it looks. I didn't get to finish my thought. Of how bad it looks to keep hiring less experienced men over more experienced women. You said "are you threatening me?" I never said I was.

*Id.* top of page.

69. In the January 5 conversation, plaintiff actually said "You should be scared of how this looks." However, Wells jumped up from his chair when he heard the word "scared" and apparently did not hear the rest of plaintiff's sentence. Exhibit 1, ¶ 3.

70. Approximately two weeks after January 5, plaintiff had a telephone conference with Mr. Stonecipher and HR. They asked what plaintiff planned to do to prevent the incident on January 5 from happening again. Plaintiff told him that she was working with her doctor on medications to help her irritability. They seemed to think that that was not enough. Plaintiff believed that they wanted plaintiff to say that she would stop being upset about discrimination in the department. Exhibit 1, ¶ 1.

71. Jeremy Woolf, the decision-maker, wrote the following in his termination document:

> I find Mr. Wells's assertion to be credible that after he asked you if you were threatening him, you said yes. I find it reasonable that Mr. Wells received this statement by you as a threat. I also find that the evidence supports that you later called Mr. Wells and continued this altercation using a raised voice, which Mr. Wells described as screaming. I do not find your subsequent characterization of that incident – that you were warning Mr. Wells of the risk of gender discrimination claims against the City – to be credible, but rather a self-serving re-characterization. There does not appear to be any reason for Mr. Wells to misrepresent this interaction [as a physical threat] in the first place.

Exhibit 5, termination letter, Bates 147, bottom.

72. Woolf terminated plaintiff because she said that Wells should be scared . *Id.* Bates 149, last paragraph.

73. Although there was a five-month delay between plaintiff being put on administrative leave on January 6 in plaintiff being terminated on June 15, 2023, this delay was caused by an outside investigation as to whether discrimination caused her to be put on administrative leave. **See** fact 40. Because she never worked after January 6, there was effectively little delay between her being put on administrative leave and her being terminated for what she said on January 5.

74. On May 10, 2023, plaintiff wrote a statement for Woolf prior to his decision to terminate her. **See** exhibit 6, her six-page statement and exhibit 7, her declaration explaining when she wrote the statement. She gave him various examples of how she was being treated differently than males under Tyler Well's supervision. Plaintiff told Woolf that in her five years with the City, she had never received a warning regarding her behavior. Exhibit 7, plaintiff's amended 2nd declaration.

75. In regard to the alleged threat she made to Mr. Wells, she told Mr. Woolf that she was referring to the department opening itself up to possible sex discrimination lawsuits by women at the plant. *Id.*

76. Plaintiff told Mr. Woolf that she had a diagnosed mental disability that Mr. Wells was triggering. She also told him that slamming doors and raising voices were common at the plant and that men have not been terminated for such actions as throwing items; flipping off, mooning, and breaking a city-owned camera; and slamming doors so hard as to put a hole in the wall. *Id.*

## V. ARGUMENT.

A. Plaintiff Satisfied the *Prima Facie* Test under *McDonnell Douglas*.

Although the City does not expressly invoke the *McDonnell Douglas* burden-shifting framework, its arguments track that analysis. The standard *McDonnell Douglas* framework initially requires a plaintiff to show a *prima facie* case. The burden then shifts to the employer to state a legitimate nondiscriminatory reason for the termination. The third step is for plaintiff to present evidence of pretext, *i.e.*, that the City's proffered reason is not worthy of belief.

A plaintiff establishes a *prima facie* case of retaliation by showing that (1) she engaged in protected opposition to discrimination, (2) a reasonable employee would have found the challenged employment action materially adverse, and (3) a causal connection existed between the protected activity and the adverse action. *Hinds v. Sprint/United Mgmt. Co.*, 523 F.*3d 1187, 1202 (10th Cir. 2002). The burden at this stage is "not onerous." Plotke* v. White, 405 F.3d 1092, 1099 (10th Cir. 2005). Indeed, only the most baseless claims fail to satisfy the *prima facie* test. *Zamora v. Elite Logistics, Inc.*, 478 F.3d 1160, 1171 (10th Cir. 2007)(McConnell, J., concurring).

1. <u>Plaintiff Engaged in Protected Opposiiton</u>.

This case does not involve a single, isolated complaint as the City would have this Court believe. Plaintiff engaged in protected activity at least six times: twice to Wells, once to Stonecipher, on January 5, 2023, the complaint that was investigated by outside counsel (**see** facts 39 and 40), and in her statement to Woolf (exhibit 6).

Title VII protects an employee who opposes conduct she reasonably believes to be discriminatory, even if the employer ultimately disagrees with that assessment. **See** *Hertz v. Luzenac America, Inc.*, 370 F.3d 1014, 1020–22 (10th Cir. 2004). The City does not dispute that plaintiff raised these complaints. Plaintiff therefore engaged in protected activity before January 5, on January 5, and during the period leading up to her termination.

However, the City argues that the manner in which plaintiff angrily expressed her opposition on January 5, 2023, removed the January 5 opposition from Title VII's protection. Motion pg. 14. Even if true, that does not impact plaintiff's opposition before and after January 5, 2023, from being protected activity. More importantly, Tenth Circuit precedent rejects that categorical approach. In *Hertz v. Luzenac America, Inc.*, 370 F.3d 1014 (10th Cir. 2004), the Court held that emotionally charged or intemperate conduct occurring in the course of opposing perceived discrimination does not automatically lose statutory protection, particularly where the conduct is provoked by discriminatory treatment. The Court held that "[a]n emotional response to a racial or religious epithet is a most natural human reaction. It would be ironic, if not absurd, to hold that one loses the protection of an anti-discrimination statute if one gets visibly (or audibly) upset about discriminatory conduct." *Id.* at 1021-22.

Here, plaintiff's January 5 statement (the basis for her termination) occurred during a discussion in which she was again objecting to what she believed were discriminatory promotion practices. Plaintiff contemporaneously (in her response email to Wells) denied making any threat and explained the statement as referring to how the

City's discriminatory conduct "looked bad." Whether plaintiff's reaction was reasonable or whether the City improperly seized on the manner of her opposition to justify termination, are questions a jury must resolve.

The City relies on *Rollins v. Florida Dept of Law Enforcement*, 868 F.2d 397 (11th Cir. 1989),[2] to argue that the manner of plaintiff's opposition stripped her complaints of Title VII protection. *Rollins* is neither controlling nor comparable. First, *Rollins* is an Eleventh Circuit decision and does not reflect the governing law in the 10th Circuit. *Hertz*, 370 F.3d at 1021.

Second, *Rollins* involved persistent, abusive conduct, including repeated name-calling and personal attacks directed at supervisors over an extended period. 868 F.2d at 401. By contrast, plaintiff's statement occurred during a discussion about perceived gender discrimination, her anger was isolated, and she contemporaneously explained that she was referring to the appearance and legal risk of the City's discriminatory conduct. That is the extent of the alleged physical threat the City relies on.

Third, unlike *Rollins*, the instant case presents a factual dispute regarding the meaning and intent of plaintiff's statement and whether it constituted protected opposition or misconduct. A reasonable jury could conclude that plaintiff did not make a threat at all and that the City seized on an ambiguous remark to escalate discipline in response to protected activity. For these reasons, the Plaintiff has met her burden in establishing that she engaged in protected activity.

---

[2] The City also relies on *Hochstadt v. Worcester Foundation*, 545 F.2d 222, 234 (1st Cir. 1976). **See** motion, page 14. This case is inapplicable for the same reasons *Rollins* does not apply herein.

2. The Termination Was an Adverse Action.

The City does not challenge that plaintiff's termination was an adverse action, the second *prima facie* element.

3. Plaintiff Has Presented Sufficient Evidence of a Causal Connection.

The City argues that plaintiff cannot establish causation because it terminated her for an alleged policy violation rather than for engaging in protected activity. Defendant entirely misses the mark on the *prima facie* case elements and analysis, essentially arguing that Ms. O'Ryan must negate the City's reasons for taking adverse actions against her at the *prima facie* case stage. That is not the law. In *Brainerd v. Schlumberger Technology Corp*., 589 Fed.Appx. 406, 410 (10th Cir. 2015) the 10th Circuit held:

> As for satisfactory performance, Brainerd argues that the district court erred in its application of *McDonnell Douglas* by impermissibly increasing her burden to prove a *prima facie* case. She contends that she did not have to disprove Schlumberger's proffer that the company terminated her for performance reasons. Rather, Brainerd asserts that she only needed to provide "credible evidence" to the district court that she was performing her job satisfactorily. Appellant's Br. at 21-22.
>
> We agree with Brainerd. To be sure, Schlumberger presented compelling evidence of Brainerd's subpar performance. But at the summary judgment stage, the district court must look at the facts in the light most favorable to Brainerd, the non-moving party. *See Bohn*, 94 F.3d at 1460. The district court did not do that. Instead of examining Brainerd's evidence, it mistakenly focused on Schlumberger's evidence supporting its reason for terminating Brainerd. This was an incorrect application of the first prong of *McDonnell Douglas's* burden-shifting framework. Schlumberger's reasoning for terminating Brainerd is "irrelevant at this point of the *McDonnell Douglas* inquiry." *Orr*, 417 F.3d at 1152.

**See also** the Court's decision in *Tuffa v. Flight Services & Systems, Inc*., 78 F.Supp.3d 1351 (D. Colo. 2015)("At the *prima facie* stage of the *McDonnell Douglas* analysis, a

plaintiff is only required to raise an inference of discrimination, not dispel the non-discriminatory reasons subsequently proffered by the defendant"). Accordingly, the City's arguments that Ms. O'Ryan violated a City policy and that it had a legitimate non-pretextual reason for terminating her are simply irrelevant at the *prima facie* stage and this Court should decline to consider them.

Moreover, at the *prima facie* stage of the *McDonnell Douglas* analysis, Plaintiff is not required to prove ultimate but-for causation or to disprove the City's asserted justification. She need only establish a causal connection between her protected activity and the adverse action—a burden the Tenth Circuit has repeatedly described as minimal. *Plotke v. White*, 405 F.3d 1092, 1099 (10th Cir. 2005). The City's argument improperly demands proof of its asserted justification and ultimate causation at step one of the *McDonnell Douglas* analysis.

Tenth Circuit precedent rejects the City's framing. The time between the protected opposition and the adverse action is sufficient to establish a causal connection to satisfy the third element of a prima facie case of retaliation. **See** *Ramirez v. Oklahoma Dep't. of Mental Health*, 41 F.3d 584, 596 (10th Cir. 1994)( a one and one-half month period between protected activity and adverse action may, without more, establish *prima facie* causation); **see also** *Anderson v. Coors Brewing Co*., 181 F.3d 1171, 1179 (10th Cir. 1999)(presumably, a temporal proximity of two months and one week is sufficient to support a prima facie case of retaliation). **See also** *Marx v. Schnuck Markets, Inc.*, 76 F.3d 324, 329 (10th Cir. 1996).

Here, plaintiff repeatedly complained of gender discrimination in a male-dominated workplace in November and December, 2022. She again complained on January 5, 2023, during the interaction that led to her removal from the workplace, and she continued to pursue discrimination complaints in May, 2023, fewer than six weeks before she was terminated. Viewing the record as a whole, a reasonable jury could find a causal connection between plaintiff's protected activity and her termination less than six weeks later. The City attempts to isolate causation to a single event on January 5 and argues that temporal proximity is lacking. Tenth Circuit precedent rejects that narrow framing. Where protected activity continues during the disciplinary process itself, temporal proximity may be assessed over the course of that pattern rather than from a single act. *Marx*, 76 F.3d at 329; *Anderson*, 181 F.3d at 1179.

a. Protected Activity That Influences Discretionary Escalation Establishes a Causal Connection.

Although ultimate liability under Title VII requires but-for causation, *Bostock v. Clayton County*, 590 U.S. 644, 656–58 (2020), that standard does not heighten plaintiff's *prima facie* burden. A causal connection exists where protected activity influences how an employer exercises discretion, including whether conduct is treated as correctable or escalated to termination.[3] Here, a reasonable jury could conclude that plaintiff's repeated complaints of discrimination influenced how the City interpreted an ambiguous statement, rejected plaintiff's explanation out of hand, and escalated

[3] On page 15 of the motion, the City asserts that plaintiff's claim fails because she has shown no evidence of Woolf's retaliatory animus. As the Supreme Court has recently made clear, "the question is whether the word "discriminate" inherently requires retaliatory intent. It does not. … In elaborating on the meaning of "discriminate," *Bostock* made clear that a lack of "animosity" is "irrelevant" to a claim of discrimination under Title VII." *Murray v. UBS Securities*, 144 S.Ct. 445, 453 (2024).

discipline to termination. That additional evidence is sufficient to support a causal connection at the *prima facie* stage.

b. Subsequent Review Does Not Eliminate Causal Connection.

The City's reliance on multiple levels of review does not defeat causation or causal connection where later decisionmakers relied on the same disputed narrative developed after protected activity. Whether any retaliatory influence carried through the review process is a factual question for the jury. Because plaintiff has presented evidence from which a reasonable jury could find a causal connection between her protected activity and her termination, summary judgment on the prima facie causation element must be denied.

B. The City Has Articulated a Facially Nondiscriminatory Reason for Termination.

At the second step of the *McDonnell Douglas* framework, the City's burden is one of producing a facially nondiscriminatory reason for plaintiff's termination. Plaintiff acknowledges that, if her statement were in fact a threat, as the City characterizes it, such conduct could constitute a legitimate, nondiscriminatory reason for termination.

C. The City's Stated Reason is Pretextual.

At the final step of the *McDonnell Douglas* analysis, the question is whether the employer's stated reason for termination is worthy of belief. Pretext may be shown in a variety of ways, including "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions" in the employer's explanation such that a factfinder could find it unworthy of credence. *Riser v. QEP Energy*, 776 F.3d 1191, 1200 (10th Cir. 2015).

The City argues that its explanation must be accepted because it claims to have believed plaintiff made a threat and that pretext must be judged from the employer's perspective. **See** motion, page 17. But pretext does not require plaintiff to prove the City's explanation false beyond dispute or to establish retaliation as the only motive. It only requires evidence from which a reasonable jury could disbelieve the City's explanation. Whether the City reasonably interpreted plaintiff's statement as a threat, or, instead, seized on an ambiguous remark made during protected opposition to justify escalation to termination, is a credibility determination for the jury.

This case does not turn on disputed words. Both parties agree plaintiff said "you should be scared." The dispute is how those words were interpreted, whether that interpretation was plausible, and whether the asserted policy-violation rationale was plausible.

1. <u>Characterizing the January 5 Statement as a Threat Is Not Believable</u>.

Plaintiff has presented sufficient facts for a jury to believe that she did not physically threaten Wells. She was 52 years old, stood 5'2" tall, and weighed 195 pounds. Wells was in his mid-thirties, stood 6'2" tall, and weighed approximately 185 pounds. On January 5, plaintiff did not swing at Mr. Wells, raise her fist at him, or touch him. She had no weapon. **See** facts 57-60. Why would Wells be physically threatened by an older, shorter, unarmed woman? In addition, Wells knew from the incident itself, and from plaintiff's follow-up email, that she said "you should be scared of how this looks." **See** facts 68 and 69. She was never even interviewed by law enforcement for alleged assault or threat. Fact 61. A jury could easily determine that Wells was not

actually physically threatened; rather, he was uncomfortable with plaintiff's outburst and elevated that to a physical fear to support his goal of terminating her. Taking the facts in the light most favorable to plaintiff, this is the fundamental implausibility that the City cannot erase on summary judgment.

2. <u>Selective Enforcement and Disproportionate Escalation Support Pretext</u>.

Even assuming that plaintiff's conduct could fall within the scope of City policy, the response was discretionary and severe. Plaintiff had no history of violence and no prior warnings for threatening conduct. Nevertheless, the City placed her on immediate administrative leave, never returned her to work, and escalated the matter directly to termination rather than to a corrective action.

Plaintiff presented evidence that in the same male-dominated workplace, men engaged in forceful and confrontational conduct without termination, including slamming doors hard enough to damage walls, throwing objects during confrontations, yelling profanities, and destroying City property. One such individual was referred to anger-management classes; others were not disciplined at all. **See** exhibit 6, page 4, top two paragraphs.

In contrast, the City treated plaintiff's ambiguous statement—made during a discussion about perceived gender discrimination—as a terminable offense, rejecting her contemporaneous explanation that she was referring to the legal risk of discriminatory practices. A jury could conclude that this disparity reflects selective enforcement and disproportionate escalation rather than neutral application of policy.

The record further supports pretext based on the City's effort to portray plaintiff as having a history of confrontational behavior. Plaintiff had never received a written warning during her five years of employment. Fact 74. The City instead relied on an unissued draft warning and a performance evaluation authored shortly after Mr. Wells became her supervisor, despite the absence of similar concerns in prior evaluations and despite plaintiff having been recommended for promotion by her previous supervisor. A reasonable jury could view this retrospective narrative as an attempt to justify termination after the fact. **See** *Stroup v. United Airlines, Inc*., 26 F.4th 1147, 1161 (10th Cir. 2022)(the jury did not believe the change from the investigation to the termination).

3. The City's Evolving Justifications Support Pretext.

The City's justification also evolved over time. Mr. Wells initially cited both the January 5 interaction and alleged performance concerns. During the disciplinary process, however, the performance rationale was rejected, and the City proceeded with termination based solely on its interpretation of the January 5 statement. A reasonable jury could view this narrowing of justifications as evidence that the City was searching for a rationale to support a decision influenced by plaintiff's protected activity.

4. Policy Labels and "Honest Belief" Do Not Defeat Pretext.

The existence of a policy does not insulate an employer from liability where protected activity influenced how that policy was interpreted or enforced. Nor does an employer's asserted "honest belief" resolve pretext at summary judgment where the belief rests on disputed facts, subjective interpretation, and selective credibility determinations. Title VII asks whether a reasonable jury could find that protected

activity influenced the decision—not whether the employer's explanation could be believed in the abstract.

5. Totality of the Circumstances.

Viewed as a whole, the selective interpretation of ambiguous conduct, the disproportionate escalation of discipline, the disregard of plaintiff's explanation, and the timing and context of Plaintiff's repeated protected complaints permit a reasonable jury to find that the City's stated reason was not its true reason. **See** *Reznik v. inContact, Inc.*, 18 F.4th 1257, 1265 (10th Cir. 2021); *Ford v. Jackson Nat'l Life Ins. Co.*, 45 F.4th 1202, 1225 (10th Cir. 2022); *Walkingstick Dixon v. Oklahoma*, 125 F.4th 1321, 1340 (10th Cir. 2025). Because the City's pretext argument depends on resolving disputed inferences in its favor, summary judgment must be denied.

D. Plaintiff Has Direct Evidence of Retaliation.

"When a plaintiff offers direct evidence of discrimination in a Title VII claim, her claim may move forward without being subjected to the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973)." *Tabor v. Hilti, Inc.*, 703 F.3d 1206, 1216 (10th Cir. 2013).

In *Tabor*, the hiring authority stated that women did not have the skills for the male-dominated job.

> Here, Mr. Teel [the hiring authority] explicitly stated a view that women have inferior knowledge of tools and inferior ability to sell tools. These statements spoke directly to central requirements of the job for which Ms. Tabor was interviewing, and he made them during a discussion about her fitness for the position. The content of his statements, the interview context, and the temporal proximity to the adverse employment decision directly link the discriminatory statements to his decision not to promote Ms. Tabor.

* * * *

> Given these circumstances, Mr. Teel's remarks may be considered direct evidence of discrimination.

*Tabor,* 703 F.3d at 1217. **See also** *Gutierrez v. DSG New Mexico, LLC*, 2022 WL 1500620, *5 (D. N. Mex. 2022)("Defendant has admitted that 'Ashley terminated Gutierrez's employment *because, due to his chronic arthritis*, he could no longer satisfactorily repair damaged furniture to showroom-quality condition and was unable to timely perform furniture repairs'")(emphasis in original).

In an earlier case, *Medlock v. Ortho Biotech, Inc*., 164 F.3d 545, 550 (10th Cir. 1999), described the direct method of proof as follows:

> To prevail via this direct method, a plaintiff must introduce direct or circumstantial evidence that the alleged retaliatory motive "actually relate[s] to the question of discrimination in the particular employment decision, not to the mere existence of other, potentially unrelated, forms of discrimination in the workplace." *Thomas v. National Football League Players Ass'n,* 131 F.3d 198, 204 (D.C.Cir.1997) ("*NFLPA* "); *see also Thomas v. Denny's, Inc.,* 111 F.3d 1506, 1512 (10th Cir.1997) (holding that plaintiff may prove discriminatory motive by "presenting 'evidence of conduct or statements by persons involved in the decisionmaking process that *may* be viewed as directly reflecting the alleged [retaliatory] attitude'"(quoting *Kenworthy v. Conoco, Inc.,* 979 F.2d 1462, 1471 n. 5 (10th Cir.1992)) (emphasis added)); *Greene,* 98 F.3d at 560 (holding that plaintiff may establish age discrimination "directly, by presenting direct or circumstantial evidence that age was a determining factor in his discharge").
>
> One month after plaintiff's deposition, during which he testified about his race discrimination claim, defendant sent a letter to plaintiff, stating: "As a result of issues raised in your deposition, effective immediately, you are suspended from all duties on behalf of the Company."

Even though the *Medlock* plaintiff referred to a number of issues in his deposition, because his complaints included complaints of racial discrimination, the termination document was deemed direct evidence of retaliation. Of course, the jury would actually determine if this statement proved retaliation or not.

In the instant case, it is uncontradicted that the City terminated plaintiff because she told Mr. Wells that "you should be scared." Although the City claims that plaintiff's words were a threat and not a complaint about gender discrimination, the City admits that but for these words, Plaintiff would not have been terminated. Woolf, himself, explicitly stated that he terminated plaintiff because of her statement to Wells. He acknowledged that plaintiff said that this "threat" was actually "warning Mr. Wells of the risk of gender discrimination claims against the City." Woolf specifically rejected plaintiff's explanation.

This is not a case requiring inference. The City has identified the precise statement that caused the termination. Plaintiff has identified that statement as protected opposition to discrimination. The jury must decide which characterization is correct. Accordingly, plaintiff has presented direct evidence of retaliation. Her claim therefore proceeds independently of the *McDonnell Douglas* framework, and summary judgment must be denied.

## VI. CONCLUSION

The City's motion depends on crediting its interpretation of disputed facts, overlooking evidence of selective enforcement and disproportionate escalation, and collapsing the *prima facie* and pretext inquiries into a single determination. Rule 56 does not permit that result and genuine disputes of material fact prevent summary judgment.

WHEREFORE, plaintiff respectfully requests that this Court deny the motion for summary judgment.

Respectfully submitted this January 30, 2026.

By: s/ *Robert M. Liechty*
Robert M. Liechty
ROBERT M LIECHTY PC
1800 Gaylord St.
Denver, Colorado 80206
Tel: (303) 861-5300
Fax: (303) 861-2746
Email: rliechty@crossliechty.com
ATTORNEY FOR PLAINTIFF

## CERTIFICATE OF SERVICE

I hereby certify that on this January 30, 2026, a true and correct copy of the above and foregoing **RESPONSE TO MOTION FOR SUMMARY JUDGMENT** was, unless otherwise indicated, filed electronically with the Court who provides notice to the following:

Kendra Smith
Danyelle Semjonovs
HALL & EVANS, LLC
1001 Seventeenth Street, Suite 300
Denver, CO 80202
smithk@hallevans.com
semjonovsd@hallevans.com

*Signed Original at Office of Robert M Liechty PC*

s/ *Robert Liechty*
Robert Liechty